## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

KRISTINA HOSKINS,                    ]
                                     ]
           Plaintiff,                ]
                                     ]
 v.                                  ]        No. 2:18-CV-
                                     ]
EASTMAN CHEMICAL COMPANY,            ]
                                     ]
           Defendant.                ]

## COMPLAINT

Plaintiff Kristina Hoskins files her complaint for relief against the defendant for its gender discrimination, disability discrimination, and age discrimination in employment and avers:

1. The plaintiff's federal question claims are properly before this Court pursuant to its federal question jurisdiction granted by *28 U.S.C. §1331.* The plaintiff's sex discrimination claims, hostile work environment claims, and retaliation claims are premised upon the provisions of Title VII of the 1964 Civil Rights Act, as amended, and as codified at *42 U.S.C. §2000e-2, §2000e-3,* and *§2000e-5.* The plaintiff's age discrimination and retaliation claims are premised upon the provisions of the Age Discrimination in Employment Act (ADEA),

codified at *29 U.S.C. §623* and §*626*. The plaintiff's disability claims are premised upon the Americans With Disabilities Act as amended (ADA) and codified at *42 U.S.C. §12102, §12111*, §*12112,* and §*12117* and *42 U.S.C. §1981a.*

2. Plaintiff Kristina Hoskins is a white female, 58 years of age. She resides in Kingsport, Sullivan County, Tennessee. At the times pertinent to her federal claims of sex, age, disability discrimination, and a hostile work environment, the plaintiff was employed by Eastman Chemical Company in its customer service department as a service representative and then as a supervisor.

3. Eastman Chemical Company is a Tennessee corporation which manufactures various chemical and plastic products. It maintains its corporate headquarters and a chemical manufacturing facility in Kingsport, Sullivan County, Tennessee. Eastman employs thousands of individuals. The company's address is 200 S. Wilcox Drive, Kingsport, TN 37660-5147. The defendant's registered agent is listed as Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

4. The plaintiff was hired into Eastman's Customer Service Department within the Global Service Chain in September 1999. In 2001, she became a Customer Service Representative in Training. In November 2003, the plaintiff was advanced to a Customer Service Representative position and received her own customer accounts to manage.

5.  In June 2013, North American Customer Service Manager Beth Perniciaro offered the plaintiff the position of a CSR Team Lead.  In that capacity the plaintiff reported to Ms. Perniciaro. All the remaining CSR team members were changed from hourly to salaried employees and were no longer paid overtime. Manager Perniciaro told the plaintiff that budgetary constraints prevented Eastman from paying her a salary increase for her new supervisory position but assured the plaintiff that a raise would be forthcoming.

6.  The plaintiff accepted the advancement opportunity and became the supervisor of an Additive Functional Products (ADF) customer service representaitves (CSR) group which sold Eastman paint and coating products in large quantities to North American strategic customers. The plaintiff attended the required Eastman leadership training programs.

7.  Plaintiff Hoskins performed her supervisory duties in a more than satisfactory fashion. As part of her duties, the plaintiff supervised, critiqued, evaluated and disciplined the individual CSRs in her group. In addition to her full time supervisory duties, the plaintiff maintained her own CSR duties for two strategic customers, Valspar Paints and Benjamin Moore Paints which required that she frequently work more than 60 hours per week.  Eastman discriminatorily refused to pay the plaintiff for her supervisory work.  Even so, the plaintiff's work efforts were more than satisfactory.  She and CSR team members received

3

Employee Team Recognition awards for their hard work.

8. On September 16, 2015, CSR team member Debbie Holbrook complained to the plaintiff that she had seen comments in another CSR's conversation folder which were uncomplimentary of her and which accused her of being "lazy." Ms. Holbrook was upset and the plaintiff allowed her to go home for the rest of the work day. Plaintiff Hoskins then contacted Human Resources staffer Marti Harrison and informed her of Ms. Holbrook's complaint. The plaintiff and the team CSRs were interviewed. Eastman's Human Resources representative Marti Harrison verbally reprimanded the offending CSRs but told them and the plaintiff that the episode would not be reflected in their personnel files.

9. Ms. Holbrook remained out of work on sick leave for nearly a month. The two CSRs who had written uncomplimentary remarks about Ms. Holbrook were warned by Eastman's Human Resources Department to cease making comments about Ms. Holbrook or any other CSR team member. One of the offending CSRs eventually transferred to another department effective May 30, 2016, and the other took an early retirement package from Eastman effective March 31, 2016. No manager or supervisor accused the plaintiff of mishandling the CSR situation

10. On December 9, 2015, Eastman offered eligible CSR employees

a Volunteer Separation Package (VSP) which provided for two weeks of severance pay for every year of the employee's service up to twelve months. Team Leads Julia Culbertson, Pat Hale, and Kevin McGlone, and the plaintiff did not receive a VSP offer. The day before, Director of Eastman's Global Supply Chain Kevin Pruitt had called the plaintiff to his office and told the plaintiff that she would not be offered the VSP because the CSR supervisors were "too vital" to be let go. Plaintiff Hoskins assured Director Pruitt that she intended to work several more years.

11. Much to her surprise, Manager Perniciaro gave the plaintiff a "less than desirable" rating under her annual evaluation's "Team Performance" heading on January 31, 2016. Manager Perniciaro attempted to justify her low evaluation by claiming that the plaintiff had failed to manage her CSR team in September 2015 when CSR Debbie Holbrook had complained about two other CSR's commenting on her work habits on the company's internal messaging system. The plaintiff objected to the lowered evaluation and advised Perniciaro that there were no "red flags" which would have put her on notice that the two CSRs were criticizing Holbrook's performance since she was not privy to the electronic messages they generated.

12. The plaintiff had personally observed all of the CSRs' interacting amicably with each other during each workday and had no reason to suspect that

5

two of them were secretly criticizing Ms. Holbrook on their computers. Prior to Ms. Holbrook's approaching the plaintiff, no CSR group member had complained about any unpleasant co-worker interactions. Prior to the plaintiff's January 2016 performance evaluation for the last half of 2015, Eastman Manager Perniciero had told the plaintiff that she was not being evaluated under the "supervisor behaviors" criteria. Manager Perniciaro's retroactive change of evaluation protocols surprised the plaintiff.

13. Manager Perniciaro refused to acknowledge the plaintiff's explanation. Perniciaro announced that the lowered evaluation was "no big deal" because upper management expected all employees to have a negative "yellow mark" on their performance in order to show that they were "working toward improvement." During later conversations with HR Manager Robin Lubic-Carmack, plaintiff Hoskins learned to the contrary that there was no upper management requirement that each employee had to pick a "yellow" section to reflect a need for improvement.

14. The plaintiff talked with HR representative J.A. Curia regarding Perniciaro's retroactively changing the 2015-performance evaluation criteria without advising her. Curia advised the plaintiff he would check with Manager Perniciaro and get back to her. He never did.

15. While she supervised her teams CSRs, the plaintiff frequently

6

stayed after working hours to assist CSRs in solving customer issues and in quarterly pricing. She entered orders for the CSRs and issued their customer invoices when she could in order to ease their work load. She was sympathetic when a few of the CSRs became emotional over their workload and regularly encouraged them in the performance of their job duties. The plaintiff worked out a system for a new Limited Service Employee (LSE) to work a veteran CSR's desk while the veteran CSR covered for an absent CSR. The CSR could train the LSE in how to work the customers and desk duties while the LSE was assisting her with the additional workload. The plaintiff took it upon herself to constantly improve her skill sets and in becoming more familiar with retrieving customer data and sales information from Eastman's various computer systems.

16. On March 7, 2016, Eastman management finally changed the plaintiff's job title to Customer Service Supervisor. Eastman held the plaintiff responsible for managing the same CSR group but did not pay her any additional compensation.

17. The official "promotion" was discriminatorily brief. In early March 2016, Ms. Cheryl Smith was moved from Sale & Marketing to Customer Service Manager under Manager Beth Perniciaro so that the plaintiff and other customer service supervisors reported to her instead of Perniciaro. The plaintiff noticed that manager Smith, a lady in her early 40's, acted stand-offish toward the

plaintiff.

18. In late March or early April 2016, Service Manager Smith looked out the office window of the CSR team's new building and saw the plaintiff's automobile parked in the handicapped parking space at the front entrance. Smith asked the plaintiff why she got to use the handicapped parking space and what was wrong with her. The plaintiff explained to Manager Smith that she had painful weak legs and back issues. The plaintiff added that she had an auto immune disorder which caused her chronic pain. Smith asked the plaintiff how long she had the problems and then told her about her own mother's illness.

19. The other customer service supervisors managed by Smith did not suffer from any disabilities and did not have to use handicapped parking spaces. Plaintiff Hoskins avers that Manager Smith's questioning her directly about her disabilities violated the ADA and is direct evidence that Smith's demoting her within a month of Smith's disabilities interrogation and thereby initiating a hostile work environment were motivated by illegal disability discriminatory animus.

20. Manager Smith frequently commented about her enjoying "running" and participating in marathons. Smith mentioned that she liked to do "walk-n-talk meetings." After the plaintiff had responded to the disability-related inquires by Manager Smith, she noticed that Manager Smith began meeting the CSRs with whom the plaintiff discussed customer support. Smith began spending

8

more time working with the other non-disabled CSR group supervisors than she did with the plaintiff. It appeared to the plaintiff that Smith was pushing the plaintiff aside. In an effort to minimize the "visibility" of her disabilities, the plaintiff hid the cane which she used to assist herself in walking when her pain required it.

21. On April 29, 2016, plaintiff Hoskins reported to a meeting with Mangers Smith and Perniciaro to discuss what she thought would be a posting for the position of one of the CSRs who had transferred off of her team. Instead, Manager Smith announced that the plaintiff would be moving back to the open CSR position on her current team. Smith added that the plaintiff would be Eastman's ambassador for Customer Service supporting Global Key Account Management (GKAM) initiative with its own set of responsibilities. Manager Smith did not ask the plaintiff if she would be interested in the GKAM initiative. She merely slid the Team Talking Points, which included the plaintiff's demotion, across the table to her. The plaintiff avers that her abrupt "demotion" came on the heels of Manager Smith's questioning her about her disability and constituted disability discrimination.

22. Plaintiff Hoskins knew that no such Global Key Account Management CSR job position actually existed. There was no written job description for the announced position. The plaintiff avers that Manager Smith deliberately and discriminatorily misled the plaintiff and set her up to fail by

9

demoting her to a position which had no real work connected with it. Six weeks after the discriminatory demotion, the plaintiff had never been assigned any work connected with GKAM initiative

23.    Manager Smith then told the plaintiff that she expected the plaintiff to train her replacement and report to the new supervisor who Eastman would choose to fill the plaintiff's vacancy. The plaintiff asked both Smith and Perniciaro why they would put her back on a CSR team which she had supervised, disciplined, denied or granted merit raises to, evaluated, and helped with personal problems for the past three years.  Eastman's two managers replied that the plaintiff had the most experience in Coatings/Paints and was most familiar with the customers of the team.  The plaintiff did her best to control her shock and surprise during the meeting.

24.    Extremely upset over the sudden demotion and betrayal, the plaintiff cried all the way home.   She needed her job to survive and was not yet ready to retire. The plaintiff decided that she had to make the best of a bad situation.  The plaintiff naively thought she could look for new opportunities within the GKAM initiatives.

25. On May 2, 2016, plaintiff Hoskins asked Manager Smith why she had been demoted.  Ms. Hoskins emphasized that she was not comfortable with going into the CSR group she had disciplined and evaluated for the past three

years.  Smith responded that the plaintiff was considered to be "highly credible" with Eastman's business partners.  The plaintiff went to the ladies' room and wept. She returned to tell Manager Smith that she didn't think it was a good idea to expect  her to be involved in interviewing or training her replacement.  Smith dismissed the plaintiff's concerns with the comment that it "was no big deal and that the plaintiff would handle it professionally."

26.  The plaintiff's emotional distress continued as Manager Smith announced to her CSR team that the plaintiff would be assuming a co-worker's role on the team and that a new supervisor would be hired.  The plaintiff wept in the restroom immediately after the meeting.

27.  In abruptly demoting the plaintiff, in returning her to the CSR group which the plaintiff had been supervising, evaluating, and disciplining, and in demanding that she interview her replacement candidates, Managers Smith and Pernicario and other managers in the chain of command deliberately violated Eastman's managerial policies and protocols regarding supervisory personnel changes and discriminated against the plaintiff.

28. As a result of the discriminatory demotion, the plaintiff was excluded from the regular meetings with management which she had attended when she was the "unofficial" supervisor of the CSR team.   Director Jean Grondin, Kevin Pruitt, Tom Morton, and Beth Pernicario  stopped talking to the plaintiff as

they had before the demotion. When she approached these managers with whom she had worked with for three years, they looked "uncomfortable."

29.   On May 9, 2016, Manager Smith told the plaintiff that CSR Debbie Holbrook had accused her of disclosing her demotion to CSR members before Smith had announced it.  The plaintiff had been too embarrassed to discuss her demotion with anyone on the CSR team.  The plaintiff denied the accusation and told Smith that she had feared team members who she had been supervising for three years would "go after her" for perceived grievances they held against her because of her earlier discipline and evaluations of their performances.

30. Plaintiff Hoskins told Smith that she was not comfortable working as a peer with team members she had supervised and about whom she had confidential employment information including disciplinary issues, pay raises, coaching plans, ratings, evaluations, and salary information. Manager Smith told the plaintiff that CSR Debbie Holbrook was "dangerous" and that she would "keep watch" over Holbrook's actions.   The plaintiff insists that Smiths party-opponent admission is evidence that she and other Eastman managers knew that the work environment which they had deliberately created for the plaintiff by demoting her and requiring her to work with employees whom she had supervised, evaluated, and disciplined for three years was "hostile."

31. The plaintiff's emotional and physical distress continued.  On May

12, 2016, Ms. Hoskins met with Human Resources representative J. A. Curia. Curia's body language indicated that he was uncomfortable talking with the plaintiff. Plaintiff Hoskins told Curia about her demotion and explained that she was in a hostile work environment. Curia told the plaintiff that her demotion was simply a "lateral move." Plaintiff Hoskins told Curia that she was being discriminated against and being held back.

32. Upset by Eastman's discriminatory mistreatment, the plaintiff explained to HR representative Curia that Eastman had not given her a VSP retirement package because she was considered to be "important as a leader." She stated that Eastman's culture was changing and that the company was hiring much younger people to fill open positions. The plaintiff wept as she talked with Curia and continued to weep in various ladies' rooms during each workday.

33. Having found her conference with HR representative Curia to be unhelpful, Plaintiff Hoskins made an appointment with Eastman's internal counselor LaDonna Carey. The plaintiff told Ms. Carey that she was humiliated, embarrassed, and emotionally fractured by the hostile work environment. Carey responded that the plaintiff was "a smart lady" and recommended she purchase and read a book entitled "Transition." When Ms. Carey told the plaintiff "to stick with it" until "things got back to normal," the plaintiff responded that she couldn't sleep at night and was suffering from nausea and diarrhea. The plaintiff explained that

she had started experiencing anxiety and panic attacks.

34. Plaintiff Hoskins told Carey that she was being replaced because Eastman management wanted younger people in the jobs and the company was hiring younger individuals for open positions.

35. The plaintiff then met with HR representative Curia a second time. She told Curia that she was taking a vacation and might not come back to work. She explained that she was at her breaking point mentally and that the stress was affecting her physical health. Curia pleaded with the plaintiff not to quit and to tell him what would make the situation better. The plaintiff responded that Eastman should pay her for having been a supervisor for three years. Curia said he would talk to VP Tom Morton about her situation and see about a different job title for her utilizing the GKAM project. Curia subsequently telephoned the plaintiff and told her that her job title would not be changed.

36. In late May, Manager Smith told the plaintiff that CSR representative Debbie Holbrook had told another supervisor that the plaintiff had deliberately missed a team meeting and gone to lunch instead. Plaintiff Hoskins told Smith that her cell phone was not synchronized with her computer's Outlook Calendar and that she hadn't received notice of the meeting she had missed. Smith replied that her cell phone frequently missed team messages. The plaintiff personally apologized to each CSR for having missed the team meeting.

37. The plaintiff took her planned vacation. After returning to work, she made a business visit to Eastman customer Akzo Nobel in Columbus, Ohio. Fortunately, the plaintiff's adult daughter lived in Columbus, Ohio. On May 30, the plaintiff experienced chest pains and shortness of breath and had to be treated in a local hospital emergency room.

38. Treating physicians determined that the plaintiff had suffered anxiety and a severe panic attack and kept the plaintiff in the hospital overnight. Ms. Hoskins was discharged on May 31. Although the plaintiff was embarrassed that all of Akzo Nobel's representatives probably knew that she had been demoted, the plaintiff was able to complete the customer visit with good results. The plaintiff spent the next evening weeping at her daughter's home and suffered another panic attack.

39. When the plaintiff returned to work at Eastman on June 6, 2016, she found that Debbie Holbrook had stacked all of the Akzo Nobel files in her chair, on her desk, and on a side bench. The plaintiff complained to Manager Smith about Holbrook's overt act of open hostility. Smith told the plaintiff that supervisor Pat Hale and she had discussed Debbie Holbrook's attitude and actions and that Debbie was "dangerous." In spite of that knowledge, Manager Smith and Eastman continued to insist that the plaintiff had to work with Holbrook on the CSR team.

40. Instead of taking positive action to stop the hostile work environment, Manager Smith and Eastman directed the plaintiff to interview candidates for her former supervisory job. Smith announced that HR had selected two men and one woman for the plaintiff to interview on June 13, 15, and 16. Each candidate was younger than the plaintiff. Smith told the plaintiff that she and supervisor Pat Hale would interview "as a team" and that Smith and Perniciaro would then interview the same candidates.

41. When supervisor Hale stopped by the plaintiff's cubicle and asked if she were "OK," the plaintiff "fell apart" and wept. Hale was kind and sympathetic. Hale stated that she did not know why management was "doing this" to the plaintiff. Hale said she would take the plaintiff into her CSR team if she could. The plaintiff responded that the three candidates for her supervisory position were all younger than she and all held college degrees. The plaintiff announced that she felt like she was being "thrown out with the trash."

42. The plaintiff continued to notice that management staff avoided her. They would turn and walk another way to avoid her in the hallway. All the managers stopped walking by the plaintiff's work cubicle. Several of the CSR team members made curt remarks to her about her being "down in the trenches where she belonged." CSR Annie Lynch asked the plaintiff how she was. When the plaintiff responded that she was trying to get organized, Lynch replied that "now

16

you know how if feels" and walked off. The plaintiff began weeping. The hostile work environment kept the plaintiff from focusing on her job duties, interfered with her work efforts, and forced her to make repeated trips to the restroom to compose herself each day.

43. During the week of June 14, 2016, the plaintiff teamed with supervisor Pat Hale to interview the three candidates for her former supervisory position. Ms. Hale commented several times that she didn't see how the plaintiff managed to do it and that she would not have been able to if she had been in the plaintiff's position.

44. After interviewing three candidates, the plaintiff sent Manger Smith a written evaluation of each one. When Smith notified the plaintiff that she wanted to discuss the candidates verbally with her and Hale, the plaintiff advised Smith that she was not really able to and that Smith shouldn't expect her to.

45. On June 20, 2016, Manager Smith directed the plaintiff to meet with her at 1:30 p.m. Smith didn't show for the scheduled meeting. Upset over the deliberate and hostile slight, the plaintiff returned to her work cubicle in a state of high anxiety. When Pat Hale stopped by asked how the plaintiff was doing, the plaintiff began weeping.

46. About 4:15 p.m. on June 20, Manager Smith walked by and commented that she had missed the meeting and would reschedule it later in the

week. The plaintiff asked to meet then. In the conference room, the plaintiff told Smith that she didn't understand "why all of this was happening" to her. Smith responded that she had only one item to discuss and it was the team's complaining about the plaintiff for not having a CSR phone. Smith said she had already placed an order to get the plaintiff a multi-line telephone so she could pick-up on team member phone calls and vice-versa. The plaintiff reminded Smith that the phones didn't ring and were so inefficient that she had requested to have all of the 800 numbers removed as a cost-savings effort.

47. Plaintiff Hoskins told Smith that she was uncomfortable with the changes Smith had made and that the GKAM was "BS." Smith admitted that she had hoped there would have been more work for the plaintiff to do. The plaintiff insisted that there was nothing for her to do to support the GKAM initiative until the project was actually up and running. Since Eastman had added the Akzo Nobel account to the plaintiff's job duties, she would soon have a "full CSR desk." The plaintiff told Smith that she felt betrayed by VP Tom Morton and Director Kevin Pruitt since they had been complimenting her as they pushed her aside.

48. The plaintiff told Smith that management had deliberately created a hostile work environment for her and that she felt threatened by the hostility and aggression displayed toward her by the CSR group members. The plaintiff reminded Smith that she had previously complained to supervisors about the hostile

work environment. The plaintiff was crying by this time and Smith asked if she needed a break to get composed. The plaintiff responded that it was "quitting time" and she wouldn't dare walk out of the conference room for others to see how upset she was.

49. The plaintiff told Manager Smith that she had worked hard for Eastman, that Eastman had invested in her training, and that it was now "a wash." The plaintiff said that the "move" looked like a demotion to everyone else and that Eastman had never given her a viable reason for its mistreating her. The plaintiff told Smith she was giving back her Eastman cell phone because other CSRs didn't have company cell phones.

50. The plaintiff then told Smith that she would not interview any additional candidates for her former supervisory position. Manager Smith responded by stating that the female candidate was selected for the interviews because Eastman couldn't have only men being interviewed. Smith added that a "male supervisor would be a better fit" for the plaintiff's team. Becoming more upset over Manager Smith's blatantly discriminatory comment, the plaintiff responded that it was obvious that Manager Smith wanted a younger person as the CSR team supervisor.

51. The plaintiff now realized the full extent of Eastman's discrimination against her. The company had "demoted" the plaintiff to make room

for a younger supervisor, preferably a man.  The plaintiff broke down emotionally, became unable to sleep,  could not stop crying, and was not able to get out of bed. The plaintiff texted Manager Smith on June 21, 2016 to advise Smith that she was ill and would not be in to work.

52.   The plaintiff's breakdown continued through June 22 and 23, 2016.  She could not stop  crying and stayed in bed. The plaintiff made an appointment with her physician. Manager Smith telephoned the plaintiff on June 23, 2016, and asked how long she would be off work.  Plaintiff Hoskins responded that she didn't know and was seeing her doctor that afternoon.  The plaintiff's physician put her off work for a month.  The plaintiff contacted Eastman's FMLA department and medical nurse and advised them of her medical situation.  She began experiencing a series of panic attacks.

53.   The plaintiff began seeing psychologist Dr. Edward Latham, PhD., on July 3, 2016 and weekly thereafter for depression and anxiety.  She was prescribed Xanax and Trazadone. Dr. Latham treated the plaintiff weekly for more than six months.  Dr. Latham continues to treat the plaintiff.

54. The plaintiff had to stop driving an automobile because of her extreme anxiety attacks in August 2016.    She filed a complaint with Eastman's Ethics Committee on August 24, 2016.  At first, the Committee representative advised the plaintiff that she should come to Building B215 to discuss her

complaint. A few weeks later, a Committee representative telephoned and stated that the Committee couldn't substantiate any Eastman wrongdoing and was dropping the plaintiff's complaint.

55. In November 2016, the plaintiff began treatment by psychiatrist Dr. Ronald Smith. Dr. Smith prescribed Klonopin, Abilify, and Cymbalta and increased the plaintiff's dosages of Trazadone and Xanax. The new medications helped calm the plaintiff and she transitioned from weekly visits to Dr. Smith to visits every two to three weeks. Dr. Smith retired in October 2017 and his replacement Dr. Buckner continues to treat the plaintiff.

56. As a result of Eastman's employment discrimination and retaliation, the plaintiff continued to suffer chronic pain and have to take pain medications and muscle relaxers. The plaintiff's Short Term disability period of six months expired January 17, 2017. Though she had intended to work for Eastman until she reached retirement age, the plaintiff was so emotionally damaged by Eastman's discrimination that she could not recover and return to work.

57. Defendant Eastman discharged the plaintiff on January 18, 2017. Eastman's long term disability insurance carrier, MetLife, delayed approving the plaintiff's LTD benefits for several months. The Advocator Group assisted Ms. Hoskins with filing for her Social Security Disability benefits. The plaintiff had to sell her house in order to generate income to survive.

21

58. The plaintiff avers that defendant Eastman deliberately and in bad faith discriminated against her because she is an older woman with a disability. Instead of allowing her to take an early retirement with other employees her age, Eastman discriminatorily denied the plaintiff the severance retirement package and demoted her into a hostile work environment which caused her to suffer a mental and emotional breakdown. As described above, Eastman managers deliberately set her up for ridicule and embarrassment from hostile CSR team members whom the plaintiff had formally supervised, evaluated, and disciplined. Defendant's discriminatorily demoting the plaintiff and placing her in a hostile work environment led directly to her mental distress and to her personal and physical injury.

59. Part of the discrimination and hostile work environment included Eastman managers violating all company protocols and insisting that she had to interview and then train her replacement. Eastman selected younger individuals for the plaintiff to interview and then announced that a male supervisor was a better fit than her for her CSR team.

60. After the plaintiff complained in her Ethics complaint about Manager Smith's discriminatory announcement regarding the company's preference for a male supervisor to replace her, Eastman attempted to avoid the appearance of gender discrimination by placing a younger female from its St. Louis office in

the plaintiff's former supervisory position.

61.  Though the plaintiff repeatedly objected to and complained about the discriminatory hostile work environment which Eastman created by demoting her back into the CSR group which she had supervised and by directing the plaintiff to interview and train her younger replacement, Eastman maintained its maliciously discriminatory, demeaning, and hostile course of action toward the plaintiff in an effort to cause her mental and physical distress and injury and to force her to resign.

62.   The above described acts of employment discrimination and hostile work environment were deliberate, malicious, willful, and in bad faith, and were perpetrated by Eastman managers as part of their gender discrimination, disability discrimination, and age discrimination toward the plaintiff.

63. Eastman's disability discrimination has continued since the plaintiff has been medically unable to return to work.  Eastman's response to the EEOC regarding the plaintiff's discrimination charges included the accusatory contention that the plaintiff was a risk for "workplace violence."  No Eastman manager or health care provider ever indicated to the plaintiff that they considered her a risk for workplace violence.  The defendant's current unsubstantiated accusation against the plaintiff confirms Eastman's earlier disability discrimination against the plaintiff and constitutes additional Eastman ADA disability discrimination.

64. The hostile work environment described above was subjectively and objectively hostile. It made the plaintiff a nervous wreck and caused her to suffer additional physical pain and personal injury. The plaintiff's increased mental and physical distress aggravated and increased her physical disabilities and made them more painful and disabling. Eastman's employment discrimination and hostile work environment injured the plaintiff, disabled her physically, and has made it impossible for her to work again.

65. As a result of Eastman's employment discrimination and hostile work environment, the plaintiff has lost wages and will continue to lose wages in the future. Her enjoyment of life has been permanently diminished and her earning capacity has been destroyed. The plaintiff had a structured loan/repayment program with Eastman/Fidelity using her 401K as collateral. The plaintiff's discriminatory mistreatment and discharge interrupted the 401K loan repayments and significantly increased the plaintiff's federal income tax liability. Eastman's malicious discrimination and hostile work environment embarrassed and humiliated her, caused her extreme mental and physical distress, and has ruined her life.

66. Eastman's employment discrimination and hostile work environment described above constitutes a discriminatory/retaliatory constructive discharge. Eastman's employment discrimination/retaliation was deliberate, malicious, willful, in continuing bad faith, and in reckless disregard of the

plaintiff's federally protected rights.

67. Eastman managers and supervisors knew that they were violating Eastman personnel employment policies and protocols which mirror federal employment discrimination statutes when they discriminatorily demoted the plaintiff and set upon a malicious course of creating and maintaining a hostile work environment with the intent to force her to resign or break her mentally and physically. Eastman managers ignored the plaintiff's objections and complaints about the escalating hostile work environment even though they observed the adverse effects their discrimination was having upon her physical health and ability to work.

68. The plaintiff avers that Eastman's malicious employment actions and hostile work environment described above was willful, malicious, in bad faith, in reckless disregard of her federally protected rights and violated Title VII of the Civil Rights Act of 1964 as amended, the Age Discrimination in Employment Act (ADEA), and the Americans With Disabilities Act (ADA).

69. Plaintiff Hoskins avers that Eastman's deliberate discrimination described above physically disabled her and caused her to have to leave work and sustain lost wages. The plaintiff is thus entitled to an award of money damages from the defendant under the ADEA. Since Eastman's age discrimination was "willful," the plaintiff is entitled to an award of liquidated damages pursuant to the

ADEA.

70. Since the defendant's gender discrimination and disability discrimination was deliberate, malicious, in bad faith, and in reckless disregard for her federally protected rights, the plaintiff is entitled to an award of compensatory damages and to an award of punitive damages from Eastman under Title VII as well to separate cumulative awards of compensatory damages and punitive damages as under the ADEA.

71. The plaintiff is entitled to an award of lost wages and benefits under Title VII and/or under the ADEA. Because Eastman's gender and disability discrimination has physically disabled her and made it impossible for her to return to work and earn a living, Eastman is also liable for an equitable award of front pay, reduced to present value, under the ADA, the ADEA, and Title VII.

72. The plaintiff is entitled to an award of attorney's fees as the prevailing party under federal statutory law.

73. The plaintiff has filed administrative charges of employment discrimination/retaliation with the EEOC, has received her right-to-sue letter, and has exhausted her administrative remedies.

WHEREFORE, THE PLAINTIFF DEMANDS:

1. Judgment against the defendant for all compensatory damages allowed by the ADA and by 42 U.S.C. §1981a.

2.  Judgment against the defendant for all punitive damages allowed by the ADA and by 42 U.S.C. §1981a.

3.  A cumulative judgment against the defendant for all compensatory damages allowed by Title VII and 42 U.S.C. §1981a.

4.  A cumulative judgment against the defendant for all punitive damages allowed by Title VII and by 42 U.S.C. §1981a.

5.  An award of lost wages and lost benefits under Title VII, the ADA, and/or the ADEA.

6.  A cumulative award of liquidated damages for the defendant's willful age discrimination under the ADEA.

7.  A jury to try the plaintiff's claims.

8. An equitable award of front pay to be determined by the Court.

9.  An award of attorney's fees as allowed by federal law to the plaintiff as the prevailing party.

10.  Such equitable other relief as will make the plaintiff whole.

Respectfully Submitted,

s/ C. R. DeVault, Jr.
CHARLTON R.  DEVAULT, JR.
TN BPR #000428
102 Broad Street
Kingsport, Tennessee
(423) 246-3601
ATTORNEY FOR THE PLAINTIFF

27